# United States Court of Appeals for the Federal Circuit

05-1283


AERO PRODUCTS INTERNATIONAL, INC.
and ROBERT B. CHAFFEE,

Plaintiffs-Appellees,

v.


INTEX RECREATION CORP.,
QUALITY TRADING, INC., and WAL-MART STORES, INC.,

Defendants-Appellants.

Michael P. Chu, Brinks Hofer Gilson & Lione, of Chicago, Illinois, argued for plaintiffs-appellees. With him on the brief were William H. Frankel, Meredith Martin Addy, Mark H. Remus, and David H. Bluestone.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for defendants-appellants. With him on the brief were Kara F. Stoll and Edward J. Naidich.

Appealed from: United States District Court for the Northern District of Illinois

Judge John W. Darrah

# United States Court of Appeals for the Federal Circuit

05-1283

AERO PRODUCTS INTERNATIONAL, INC.
and ROBERT B. CHAFFEE,

Plaintiffs-Appellees,

v.

INTEX RECREATION CORP.,
QUALITY TRADING, INC., and WAL-MART STORES, INC.,

Defendants-Appellants.

DECIDED: October 2, 2006

Before RADER, SCHALL, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge SCHALL. Concurring opinion filed by Circuit Judge DYK.

SCHALL, Circuit Judge.

Aero Products International, Inc. ("Aero Products") and Robert B. Chaffee (collectively "Aero") sued Intex Recreation Corp. ("Intex"), Quality Trading, Inc. ("Quality Trading"), and Wal-Mart Stores, Inc. ("Wal-Mart") (collectively "defendants") in the United States District Court for the Northern District of Illinois for infringement of U.S. Patent No. 5,367,726 ("the '726 patent") and for infringement of Aero's registered trademark "ONE TOUCH." Following a jury trial, the district court entered judgment of

infringement and non-invalidity in favor of Aero with respect to the asserted claims of the '726 patent and with respect to Aero's trademark claim. Based upon that judgment, the court awarded Aero damages in the total amount of $6.9 million. See Aero Prods. Int'l, Inc. v. Intex Rec. Corp., No. 02 C 2590, 2004 U.S. Dist. LEXIS 25941 (N.D. Ill. Dec. 15, 2004) ("Order Denying New Damages Trial"). The total damages award was based on the jury's finding that Aero was entitled to recover $2.95 million as patent infringement damages, which the district court doubled based upon the jury's finding of willful infringement, Aero Prods. Int'l, Inc. v. Intex Rec. Corp., No. 02 C 2590, 2004 U.S. Dist. LEXIS 13453, at *13 (N.D. Ill. July 15, 2004) ("Order Awarding Enhanced Damages"), and $1 million as trademark infringement damages. See Order Denying New Damages Trial, 2004 U.S. Dist. LEXIS 25941, at *2-3. In addition, the district court entered a permanent injunction in favor of Aero. Aero Prods. Int'l, Inc. v. Intex Rec. Corp., No. 02 C 2590, 2004 U.S. Dist. LEXIS 28131 (N.D. Ill. Sept. 15, 2004); Aero Prods. Int'l, Inc. v. Intex Rec. Corp., No. 02 C 2590, 2004 U.S. Dist. LEXIS 18648 (N.D. Ill. Sept. 15, 2004).

Defendants now appeal from the court's judgment. We see no error in the judgment of infringement and non-invalidity in favor of Aero. We do conclude, however, that, in the circumstances of this case, the award of both patent infringement and trademark infringement damages in favor of Aero represents an impermissible double recovery. Accordingly, we vacate the award of $1 million in trademark infringement damages in favor of Aero. We thus affirm-in-part, vacate-in-part, and remand to the district court for entry of a final judgment in favor of Aero consistent with this opinion.

BACKGROUND

I.

The invention claimed in the '726 patent "relates to inflatable support systems, which may include air mattresses, and inflation and control thereof."[1] '726 patent col.1, ll.14-16. The aspect of the invention that is the focus of this appeal is the claimed valve assembly. It is by means of the valve assembly that the air mattress is inflated and remains inflated. Id., col.3, l.68, to col.4, l.2.

Figure 3 of the '726 patent shows a cross-section of the valve assembly.



FIG. 3

Id., fig. 3. Describing the operation of the valve assembly shown in Figure 3, the specification states that "[i]nflation is provided to the mattress 10 by means of the inflation input 322 having exterior threads 321 . . . ." Id., col.3, l.68, to col.4, l.2. The specification further states that "[a]ir pressure at the inflation input 322 causes the downward displacement of diaphragm 34 away from its valve seat 36, thereby permitting air flow through the first cylinder 32 via the triangular passageways 37." Id., col.4, ll.8-12. After the mattress has been inflated to the desired extent "and air pressure is removed from inflation input 322, the pressure of air in the mattress 10

---

[1] For simplicity, we refer to the invention as being directed to inflatable air mattresses.

urges the diaphragm 34 against valve seat 36 and produces a positive seal against the exit of air from the mattress." Id., col.4, ll.14-18. Thus, the valve assembly is described as "dual," id., col.3, l.65, because it (i) controls the flow of air into the mattress and (ii) operates to keep air in the mattress once the mattress is inflated.

Figure 15 of the '726 patent shows a cross-section of an alternative embodiment of the valve assembly. Id., fig.15. It includes a coupling labeled 1541 and an inflation input labeled 1542.



FIG. 15

Id., fig.15 & col.9, ll.34-35. The specification states that, in this embodiment, "[a] circular coupling 1541 includes an open end that constitutes the inflation input 1542. It also has a flared end that provides the valve seat 1543 in the form of a circular lip." Id., col.9, ll.34-37. The specification further states that "[i]t can be seen that the diaphragm [1544] can be accessed by an individual directly from the inflation input 1542 and can be pushed axially into an open position." Id., col.9, ll.41-43. Figure 17 below shows a top view of the embodiment in Figure 15, with the cover assembly in a closed position. Id., fig.17. The figure shows an inflation input labeled 1542:



FIG. 17

Id., fig.17. The specification explains that, as shown in Figure 17, "the inflation input 1542 may be provided with a bayonette mount or other means for affixing an inflation device." Id., col.9, ll.52-55.

Five claims of the '726 patent are at issue: claim 9 and claims 12 through 15. Claims 9 and 12 are independent claims. Independent claim 9 states:

An inflatable support system, comprising:
an inflatable body having an interior, an exterior, and inflation input for transfer of air between the interior and exterior; and
a one-way valve, disposed between the interior and the inflation input, for controlling the transfer of air, providing a substantially hermetic seal under low pressure conditions, such valve including:
a passageway having a general circular cross section and a first end in communication with the interior and a second end in communication with the inflation input;
a circular lip, disposed peripherally in the passageway and protruding radially inward, having a first surface generally facing the interior, defining a valve seat;
a flexible circular diaphragm, having an interior surface generally facing the interior and an outer surface facing away from the interior mounted for axial movement in the passageway away from and against the valve seat in respectively open and closed positions of the valve, so that an outer annular region of the outer surface of the diaphragm engages against the valve seat in the closed position; and
a generally circular coupling defining the passageway, the coupling having an open end defining the inflation input and a flared end,

05-1283                          5

contiguous therewith, providing the circular lip, so that the (i) the coupling at the open end has a smaller internal diameter than at the flared end and (ii) the diaphragm can be pushed axially to open the valve by reaching into the open end of the coupling.

Id., col.10, l.47, to col.11, l.11.  Independent claim 12 of the '726 patent states:

An inflatable body comprising:
an inflatable bladder having an interior and an inflation input;
a one-way valve disposed between the interior and the inflation input providing a substantially hermetic seal under low pressure conditions, such valve including:
a passageway having a generally circular cross section and a first end in communication with the interior and a second end in communication with the inflation input;
a circular lip, disposed peripherally in the passageway and protruding radially inward, having a first surface generally facing the interior, defining a valve seat;
a flexible circular diaphragm, having an inner surface generally facing the interior and an outer surface facing away from the interior, mounted for axial movement in the passageway away from and against the valve seat in the respectively open and closed positions of the valve, so that (i) the act of inflation of the bladder under low pressure is sufficient to cause axial motion of the valve into the open position to permit the large influx of air and (ii) following inflation of the bladder, air pressure created in the interior [of] the bladder by inflation thereof causes an outer annular region of the outer surface of the diaphragm to be urged into engagement against the valve seat to provide a complete hermetic seal when the valve is in the closed position; and
stiffening means for reducing flexing of the diaphragm except in its outer annular region.

Id., col.11, ll.27-59.  Dependent claims 13-15 depend on independent claim 12.  Id., col.12, ll.1-9.

## II.

Aero Products sells inflatable air mattresses.  In 1991, Mr. Chaffee licensed his technology to Aero Products.  The '726 patent number is marked on the mattress Aero Products sells, as well as on the product packaging, related documentation in the form of "sell sheets," and instructions.  To help market its products, Aero Products coined the

term "ONE TOUCH." Aero first used "ONE TOUCH" in November of 1991. It registered the trademark with the United States Patent and Trademark Office in June of 1994. U.S. Trademark Reg. No. 1,839,444. The mark "ONE TOUCH" appears on commercial embodiments of the invention of the '726 patent.

Intex also sells inflatable air mattresses. Intex introduced its accused air mattresses in 2000 and sold them to retailers such as Quality Trading and Wal-Mart, who in turn sold them to the public. Intex used the term "One Touch" on its website, and "One Touch" was also used on Quality Trading's website.

III.

A.

On April 10, 2002, Aero sued defendants. Aero claimed that the Intex air mattress infringed the '726 patent and that Wal-Mart and Quality Trading sold the infringing air mattresses. It also claimed that defendants infringed Aero Products's trademark "ONE TOUCH." After Aero filed suit, Intex sought an opinion of counsel regarding infringement. Mr. Rod Berman, the opining attorney, issued a noninfringement opinion on August 22, 2002.

As far as the alleged patent infringement was concerned, the dispute between the parties focused on whether Intex's air mattress met the limitations of claims 9 and 12 of the '726 patent relating to the inflation and sealing of the claimed mattress. The part of the accused device that relates to inflation of the Intex mattress is depicted below:



The relevant parts of the accused device are (1) the pump, (2) the cylinder, (3) the exterior of the mattress, (4) the interior of the mattress, (5) the valve, (6) the "short inner cylinder," and (7) the diaphragm. In the accused device, air enters the valve through the pump, which is on the exterior of the mattress.

On November 3, 2003, a <u>Markman</u> hearing was held on the disputed meanings of "inflation input" in claim 9[2] and "complete hermetic seal" in claim 12. <u>Aero Prods. Int'l, Inc. v. Intex Rec. Corp.</u>, No. 02 C 2590, 2004 U.S. Dist. LEXIS 1202 (N.D. Ill. Jan. 27, 2004) ("<u>Markman Order</u>"). Aero argued that "inflation input" meant the point at which air enters the passageway. According to Aero, as used in claims 9 and 12, the term "passageway" refers to "a way that allows a passage of air to and from the interior of the bed." Defendants' position was that "inflation input" should be construed as "the end of the coupling or passageway most distal from the interior" of the air mattress. In

---

[2]    The term "inflation input" appears in both claims 9 and 12. However, for <u>Markman</u> purposes, the district court focused on it in the setting of claim 9. Neither party suggests the term has one meaning in claim 9 but a different meaning in claim 12.

advancing this construction, defendants argued that, as used in claims 9 and 12, the term "passageway" refers to "a path that runs along the entire length of the coupling."

Aero argued that the "complete hermetic seal" in claim 12 of the '726 patent is "a seal that does not require any additional parts to retain 'nearly' or 'largely' all of the air in the bed such that the bed maintains its desired firmness for the expected duration of use." Defendants argued that the term "complete hermetic seal" should be construed to mean "a seal that is 'impervious to air.'" Defendants reasoned that because the parties agreed that a "substantially hermetic seal" is "nearly or largely impervious to air," then a "complete hermetic seal" would be "impervious to air."

On January 27, 2004, the district court rendered its claim construction. Id. Agreeing with Aero's construction of the term "passageway," the court interpreted the term "inflation input" in claim 9 to refer to "where air enters the passageway." Id. at *12, 17. The court reasoned that based on the text of claim 9, the inflation input must be placed where the open end exists. Id. at *11. The district court interpreted the term "complete hermetic seal" in claim 12 to mean "a seal that does not require any additional parts to retain nearly or largely all of the air in the bed." Id. at *18. The district court reasoned that there was only one "seal" used in claim 12: "[t]hat seal cannot be substantially hermetic, or allowing some air to leak through, while at the same time being complete, or allowing no air to leak through. This construction would be absurd and would render the construction of the term substantially hermetic seal illusory." Id. at *16.

On February 18, 2004, the district court presided over a jury trial on the issues of patent and trademark infringement, patent validity, and patent and trademark damages.

05-1283                                    9

At trial, Aero sought reasonable royalty damages of $3.4 million for infringement of the '726 patent based on sales of the accused Intex air mattresses. For the alleged infringement of the "ONE TOUCH" trademark, Aero sought to recover damages in the amount of $2.2 million, asserting that this figure represented Intex's profits based on sales of the accused Intex air mattresses.

On February 25, 2004, the jury found Intex liable for willful infringement of claim 9 and claims 12 through 15 of the '726 patent and Intex and Quality Trading liable for trademark infringement of the "ONE TOUCH" trademark. The jury found that claim 9 and claims 12 through 15 of the '726 patent were not invalid and awarded Aero $2.95 million for patent infringement damages and $1 million as disgorgement of Intex's and Quality Trading's profits for trademark infringement damages.[3]

The district court then considered Aero's motion for enhanced patent damages and attorney fees. The court reviewed the details of defendants' infringement and alleged litigation misconduct and doubled the patent damages pursuant to 35 U.S.C. § 284. Order Awarding Enhanced Damages, 2004 U.S. Dist. LEXIS 13453, at *14. The district court also found that the case was exceptional pursuant to 35 U.S.C. § 285 and ordered Intex to pay Aero's attorney fees. Id. at *13-14. The court based its decision to enhance damages and to award attorney fees on its findings that the case was not close, that Intex copied Aero's commercial embodiment, that Intex did not rely in good faith on the opinion of counsel noted above, that Intex misbehaved during discovery and at trial, and that Intex concealed its misconduct. Id. at *5-13. Thus, the district court

---

[3] Although the record is not entirely clear, it appears that Wal-Mart was held liable for patent infringement but was not held liable for trademark infringement. In any event, Wal-Mart was not dismissed from the case and is subject to the permanent injunction.

added $2.95 million in enhanced damages and awarded attorney's fees, resulting in a total award in favor of Aero of $6.9 million. See id. at *14.

The district court also found that claim 12 of the '726 patent was not invalid by reason of indefiniteness. Aero Prods. Int'l, Inc. v. Intex Rec. Corp., No. 02 C 2590, 2004 U.S. Dist. LEXIS 12894 (N.D. Ill. July 7, 2004) ("Indefiniteness Opinion"). Prior to trial, the court granted Aero's motion in limine to exclude argument and evidence from the jury relating to indefiniteness. After trial, on March 11, 2004, Aero moved for judgment that claim 9 and claims 12 through 15 of the '726 patent were not indefinite. Defendants responded that the use of both "substantially hermetic seal" and "complete hermetic seal" in claim 12 rendered the claim indefinite because the terms were ambiguous and inconsistent. Aero countered that the requirement of both a "substantially hermetic seal" and a "complete hermetic seal" did not render the claim indefinite, as the second description of the seal addressed the mechanical completeness of the seal as opposed to the quality of the seal. The court noted that "the issue of whether Defendants' defense of indefiniteness applies is a question of law reserved for the Court's determination." Id. at *2. The court pointed to the testimony of Dr. Albert Karvelis, Aero's technical expert. Id. at *7. Dr. Karvelis testified that the terms "substantially hermetic seal" and "complete hermetic seal" would be understandable to a person of ordinary skill in the art. Id. In view of its claim construction noted above, the court concluded that "complete hermetic seal" did not contradict "substantially hermetic seal" and thus rejected defendants' argument that claim 12 was indefinite. Id. at *10-11.

Defendants also moved for judgment as a matter of law ("jmol"), for remittitur, and for a new trial on damages. See Order Denying New Damages Trial, 2004 U.S. Dist. LEXIS 25941. Defendants argued that Aero had improperly recovered double damages because the exact same devices were accused of both trademark and patent infringement. They argued that, for this reason, they were entitled to either a new trial on damages or remittitur. In opposing defendants' motion, Aero argued that awarding patent and trademark damages did not constitute an impermissible double recovery because "Intex committed two distinct wrongful acts that were completely independent of each other." The district court agreed with Aero, concluding that a "patentee is entitled to recover the loss it suffered without regard to whether the infringer profited," whereas "trademark infringement damages are premised on unjust enrichment and compensation theories." Id. at *12. The court therefore denied defendants' motions. Id. Based upon the jury's verdict and its own rulings, the court entered judgment in favor of Aero as outlined above. Id.

The court then entered a permanent injunction against defendants precluding them from making, using, selling, or offering to sell in the United States or importing into the United States inflatable devices that infringe claim 9 and claims 12 through 15 of the '726 patent. Aero Prods. Int'l, Inc. v. Intex Rec. Corp., No. 02 C 2590, slip op. (N.D. Ill. Sept. 14, 2004).

Defendants timely appealed the judgments against them. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

I.

The first issue we consider is infringement. Defendants argue that the jury's verdict of infringement was based upon an incorrect claim construction and that, under the correct construction, the accused Intex air mattress does not infringe. Defendants do not argue that the mattress does not infringe under the district court's claim construction.

Claim construction is a question of law that we review de novo. Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). The words of a claim "'are generally given their ordinary and customary meaning.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Id. at 1313. The claims themselves provide "substantial" guidance as to the meaning of claim terms. Id. at 1314. The claims must be read in light of the specification, the "'single best guide to the meaning of a disputed term.'" Id. at 1315 (quoting Vitronics, 90 F.3d at 1582). A court should also consider the patent's prosecution history, if in evidence. Id. at 1317. The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id.

As noted above, the district court interpreted the claim term "inflation input" to mean the point at which air enters the passageway. On appeal, as they did in the district court, defendants argue that, in addition to being the point at which air enters the passageway, the inflation input must be the end of the coupling that is most distal from the end of the inflatable body. They base this construction on the argument that claim 9 and claim 12 of the '726 patent specify that the valve for controlling the transfer of air must be "disposed between the interior [of the inflatable body] and the inflation input." As a result, defendants reason, the inflation input must be above or below, and not within, the valve. Hence, according to defendants, this means that the inflation input must be the end of the coupling that is most distal from the end of the inflatable body.[4] Aero responds that the district court's construction of "inflation input" in claim 9 is correct because the plain language of claim 9, as well as the supporting specification and drawings, teach that the "inflation input" is "the place where air enters the passageway."

Claim 9 of the '726 patent claims "an inflatable support system" that comprises an inflatable body having an interior, an exterior, and an inflation input for transfer of air between the interior and exterior. '726 patent, col.10, ll.48-50. Claim 9 states that the inflatable support system has "a one-way valve, disposed between the interior and the inflation input, for controlling the transfer of air" and that the valve includes "a

---

[4] Defendants appear to assert that there would be no infringement under their proposed construction of "inflation input" because the top of the short inner cylinder in the accused Intex device, see the above drawing of the accused device, where air enters, is within the valve, rather than at the top of it, as the claims require. Thus, so the argument goes, there is no infringement because, in the valve of the accused Intex mattress, the "inflation input" is not at the coupling that is most distal (furthest away) from the end of the air mattress.

passageway having a general circular cross section and a first end in communication with the interior and a second end in communication with the inflation input." Id., col.10, ll.51-58. The claim further states that the inflatable support system has "a generally circular coupling defining the passageway, the coupling having an open end defining the inflation input and a flared end, contiguous therewith, providing the circular lip, so that (i) the coupling at the open end has a smaller internal diameter than at the flared end and (ii) the diaphragm can be pushed axially to open the valve by reaching into the open end of the coupling." Id., col.11, ll.4-11. This is most clearly illustrated in Figure 15 of the '726 patent. Claim 12 of the '726 patent claims "[a]n inflatable body" that comprises "an inflatable bladder having an interior and an inflation input." Id., col.11, ll.27-29. Claim 12 further states that the "inflatable body" comprises "a one-way valve disposed between the interior and the inflation input," as well as "a passageway having a generally circular cross section and a first end in communication with the interior and a second end in communication with the inflation input." Id., col.11, ll.30-31, 34-37. We see nothing in the language of claims 9 and 12 that limits the term "inflation input" to anything other than "where air enters the passageway." Moreover there is certainly nothing in the claim language that limits the location of the inflation input to the end of the coupling that is most distal from the end of the inflatable body, as urged by defendants.[5]

The specification further supports this conclusion. Figures 3, 15, and 17 demonstrate possible embodiments with inflation inputs. Id., figs.3, 15, & 17. These

---

[5] We see no error in the district court's construction of the term passageway ("a way that allows a passage of air to and from the interior of the bed"), which defendants do not challenge on appeal. See Markman Order, 2004 U.S. Dist. LEXIS 1202, at *12.

embodiments do not require a definition of "inflation input" that limits the location other than to "where air enters the passageway." Indeed, all three of the figures show the inflation input as a place where air enters the passageway. The rest of the specification also supports this interpretation, as it explains that "[i]nflation is provided to the mattress [ ] by means of the inflation input . . . ." Id., col. 3, l. 68, to col. 4, l. 2. Finally, there is nothing in the prosecution history that would alter this meaning.

In sum, the claim language, the specification, and the prosecution history support the district court's construction of the term "inflation input." Accordingly, we will not disturb that construction.[6]

---

[6] We reject defendants' claim that the district court erred by construing the term "inflation input" in light of the accused device. There is no basis for the argument that the district court improperly relied on the accused device. Although the court revealed an awareness of the accused device, the court's awareness of the accused device is permissible. See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1326-27 (Fed. Cir. 2006) ("While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction."); Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1580 (Fed. Cir. 1991) ("Of course the particular accused product (or process) is kept in mind, for it is efficient to focus on the construction of only the disputed elements or limitations of the claims.").
Defendants also argue that the district court amended its claim construction because the court refused to allow defendants to argue to the jury that, in the accused device, the top of the tall outer cylinder was the "inflation input" and "open end" of the coupling. We do not agree. During trial, Intex was prohibited from rearguing the claim construction or attempting to use the naked language of the claims—instead of the district court's claim construction. Thus, when counsel for Intex addressed infringement by referring to the claim language, instead of the court's claim construction, the district court warned him that "I've now construed the claim and asking questions which would suggest that my construction is somehow at variance with the claim is unfair." The court did not stop defendants from discussing infringement or referring to the court's construction. In short, we do not read the colloquy between counsel and the district court as evidence of a revised claim construction of "inflation input" at trial.

B.

On appeal, defendants also challenge the district court's construction of the term "complete hermetic seal" in the limitation of claim 12 relating to a "flexible circular diaphragm." As seen, the court construed this term to mean "a seal that does not require any additional parts to retain nearly or largely all of the air in the bed." Markman Order, 2004 U.S. Dist. LEXIS 1202, at *16-17. Defendants argue that the court's construction of "complete hermetic seal" is inconsistent with the specification because the specification indicates that the language "complete hermetic seal" relates to the quality of the seal and not its mechanical completeness. They argue in addition that the prosecution history expressly indicates that the phrase "complete hermetic seal" refers to the degree of sealing, so a complete hermetic seal is one that is "impervious to air."[7] Aero responds that the district court did not err in construing "complete hermetic seal" in claim 12 to mean that the valve does not require any additional parts to form a seal. It urges that the court's construction is not inconsistent with the specification and that the term "complete hermetic seal" was added during prosecution to distinguish prior art that required additional parts to form a seal, such as a lid.

In our view, the district court properly construed the term "complete hermetic seal" in claim 12. Claim 12 recites that the "inflatable body" of the invention comprises "an inflatable bladder having an interior and an inflation input" and "a one-way valve disposed between the interior and the inflation input providing a substantially hermetic seal under low pressure conditions." '726 patent, col.11, ll.28-32. The "substantially

---

[7] Defendants assert that there would be no infringement under their proposed claim construction of "complete hermetic seal"—namely, a seal that is "impervious to air"—because the accused Intex device leaks some air and thus is not "impervious to air."

05-1283 17

hermetic seal" is the only seal that is claimed. The claim goes on to explain that the one-way valve includes "a flexible circular diaphragm" so that, "following inflation of the bladder, air pressure created in the interior [of] the bladder . . . causes an outer annular region of the outer surface of the diaphragm to be urged into engagement against the valve seat to provide a complete hermetic seal when the valve is in the closed position." Id., col.11, ll.42-57 (emphasis added). We read the quoted claim language as doing two things. First, it tells the reader that the one-way valve provides a "substantially hermetic seal." Second, it explains to the reader how that "substantially hermetic seal" comes about: specifically, by air pressure causing a region of the outer surface of the diaphragm to become engaged against the valve seat. In other words, the claim language tells one of skill in the art the manner in which the claimed "substantially hermetic seal" is accomplished. While defendants' argument would have been squarely foreclosed had the inventor referred to "a completed hermetic seal," we are not prepared to hold that the inventor's less-than-perfect wording undermines the claim construction that emerges from the otherwise clear language of claim 12. We also think the district court was correct when it stated that interpreting the claimed seal as being a seal that does not allow any air to leak through would render the term "substantially" illusory. Markman Order, 2004 U.S. Dist. LEXIS 1202, at *16; see Merck & Co. v. Teva Pharms. USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). In sum, the claim language supports the district court's construction that "complete hermetic seal" means "a seal that does not require any additional parts to retain nearly

or largely all of the air in the bed." Markman Order, 2004 U.S. Dist. LEXIS 1202, at *16-17.

We are not persuaded by defendants' argument that the district court's claim construction is at odds with the specification and the prosecution history. The specification requires little discussion. Referring to Figure 3 above, it simply states that, "[w]hen air has been placed within the mattress 10 under modest pressure, . . . and air pressure is removed from inflation input 322, the pressure of air in the mattress 10 urges the diaphragm 34 against valve seat 36 and produces a positive seal against the exit of air from the mattress." '726 patent, col.4, ll.12-18. This language does not, in any way, suggest that the seal of claim 12 must be "complete" in terms of being air-tight.

Turning to the prosecution history, the '726 patent issued from U.S. Patent Application No. 992,814 ("the '814 application"), which was filed on December 16, 1992, as a continuation-in-part of U.S. Patent Application No. 384,786 ("the '786 application"). As originally filed, independent claim 12 of the '814 application required a "substantially hermetic seal":

> An inflatable bed comprising:
>     an inflatable bed having an interior and an inflation input;
>     a one-way valve disposed between the interior and the inflation input providing a substantially hermetic seal under low pressure conditions, such valve including:
>     a passageway having a generally circular cross section and a first end in communication with the interior and a second end in communication with the inflation input;
>     a circular lip, disposed peripherally in the passageway and protruding radially inward, having a first surface generally facing the interior, defining a valve seat; and
>     a flexible circular diaphragm, having an inner surface generally facing interior and an outer surface facing away from the interior, mounted for axial movement in the passageway away from and against the valve seat in respectively open/and closed positions of the valve, so that an

outer annular region of the outer surface of the diaphragm engages, against the valve seat when the valve is in the closed position.

(Emphasis added). Claim 12 and dependent claims 13 through 15 of the '814 application were rejected under 35 U.S.C. § 103 as being obvious in view of U.S. Patent No. 4,579,141, which issued to Heino Arff ("the Arff patent").[8] The Examiner explained that it would have been obvious to a person of ordinary skill in the art to use the check valve taught by the Arff patent:

> Arff shows a filling and discharge valve used for an inflatable body that comprises an annular flange . . . that includes a cylindrical portion . . . upon which a cap . . . can be screwed. A passage is defined through the flange which receives a spring loaded check valve . . . that includes an annular diaphragm . . . . The diaphragm rests against an annular sealing face defined by annular sealing ring . . . . Note that the lower end of the sealing ring is defined by an annular surface that faces down and into the inflatable body, the valve diaphragm rests against this face to form the seal. While the Arff valve is used upon an inflatable boat, it is clear that its use is not so limited. Since it is well known in the art to use a one way check valve similar to Arff's upon an air mattress, it would have been obvious to one of ordinary skill in the art [to] use the specific check valve taught by Arff upon an air mattress.

> In response to this rejection, the inventor amended claim 12 so that it reads, in its present form, as follows:

> An inflatable [bed] body comprising:
>     an inflatable bladder having an interior and an inflation input;
>     a one-way valve disposed between the interior and the inflation input providing a substantially hermetic seal under low pressure conditions, such valve including:
>     a passageway having a generally circular cross section and a first end in communication with the interior and a second end in communication with the inflation input;
>     a circular lip, disposed peripherally in the passageway and protruding radially inward, having a first surface generally facing the interior, defining a valve seat; [and]

---

[8] The Arff patent is directed to a filling and discharging valve for inflatable hollow bodies, such as dinghies.

a flexible circular diaphragm, having an inner surface generally facing the interior and an outer surface facing away from the interior, mounted for axial movement in the passageway away from and against the valve seat in the respectively open and closed positions of the valve, so that <u>(i) the act of inflation of the bladder under low pressure is sufficient to cause axial motion of the valve into the open position to permit the large influx of air and (ii) following inflation of the bladder, air pressure created in the interior the bladder by inflation thereof causes</u> an outer annular region of the outer surface of the diaphragm [engages] <u>to be urged into engagement</u> against the valve seat <u>to provide a complete hermetic seal</u> when the valve is in the closed position<u>; and</u>

    <u>stiffening means for reducing flexing of the diaphragm except in its outer annular region</u>.

(Bracketed material removed, underlined material added). Aero explained that claim 12 had been amended to "claim the subject matter of the invention more distinctly." It also explained that claim 12 "as amended now requires stiffening means for reducing flexing of the diaphragm except in its outer annular region." Aero asserted that the amendment was supported by the specification. The Examiner thereafter issued a Notice of Allowance.

As seen, the term "complete hermetic seal" was added to claim 12 after a rejection based on the Arff patent. However, the Examiner did not cite the Arff patent against claim 12 because of the quality of the seal in claim 12. The inventor explained that claim 12 was being amended, in light of the Arff patent, to require a stiffening means. There is nothing in the prosecution history to suggest that claim 12 was being modified to add a requirement for a completely hermetic seal. Thus, contrary to defendants' argument, the language "complete hermetic seal" was not added to distinguish the Arff patent based on the limitation of a seal that is completely impervious to air, as defendants urge. In short, the prosecution history does not support defendants' claim construction argument.

As noted, defendants argue that the jury's infringement verdict is based on an incorrect claim construction and that they do not infringe under the correct claim construction. Defendants do not argue that they do not infringe under the district court's claim construction. Because we affirm the district court's claim construction, the judgment of infringement resulting from the jury's verdict is affirmed.

II.

As noted, after the jury trial the district court considered the legal issue of definiteness and held that claim 12 of the '726 patent was not invalid by reason of indefiniteness. Indefiniteness Opinion, 2004 U.S. Dist. LEXIS 12894. On appeal, defendants raise again the argument that claim 12 of the '726 patent is invalid by reason of indefiniteness.

A patent is presumed valid, and the burden of establishing invalidity as to any claim of a patent rests upon the party asserting such invalidity. 35 U.S.C. § 282. Clear and convincing evidence is required to invalidate a patent. Typeright Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151, 1157 (Fed. Cir. 2004). A determination of whether a claim recites the subject matter that the applicant regards as its invention and is sufficiently definite so as to satisfy the requirements of 35 U.S.C. § 112, ¶ 2,[9] is a legal conclusion that we review de novo. Allen Eng'g Corp. v. Bartell Indus., 299 F.3d. 1336, 1348 (Fed. Cir. 2002); Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 702 (Fed. Cir. 1998). If a claim is not amenable to construction, the claim is invalid as indefinite under 35 U.S.C. § 112, ¶ 2. Novo Indus., L.P. v. Micro Molds Corp.,

---

[9] Section 112, paragraph 2, states: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

350 F.3d 1348, 1353 (Fed. Cir. 2003). If a claim is amenable to construction, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," the claim is not indefinite. Exxon Res. & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

Defendants contend that claim 12 is indefinite and that the district court had to rewrite the claim to make it valid. They argue that while there is only one seal in claim 12, the claim simultaneously requires both a "substantially hermetic seal under low pressure conditions" and a "complete hermetic seal when the valve is in the closed position." They assert that the addition of the second phrase during prosecution rendered the claim indefinite. Aero responds that claim 12 is not indefinite because it is capable of construction.

Because, as just seen, claim 12 is capable of being construed, it is not indefinite. The term "complete hermetic seal" refers to the mechanical completeness of the seal, while the term "substantially hermetic seal" refers to the quality of the seal. During trial, Aero's technical expert, Dr. Karvelis, testified to his understanding of the claim terms. See Indefiniteness Opinion, 2004 U.S. Dist. LEXIS 12894, at *7. As the district court recognized, "[t]hese terms, when read in combination and in light of the specification of the '726 patent, would be understandable to a person of ordinary skill in the art." Id. We see no error in the district court's determination that claim 12 is not indefinite.

III.

As noted, the district court denied defendants' motion for remittitur and for a new trial on damages, rejecting the argument that awarding Aero damages for both patent and trademark infringement constituted an impermissible double recovery. Order

<u>Denying New Damages Trial</u>, 2004 U.S. Dist. LEXIS 25941.  Defendants raise the damages issue again on appeal.

We apply our own law with respect to issues of substantive patent law and also with respect to certain procedural issues pertaining to patent law; we apply the law of the regional circuits on non-patent issues.  See <u>Midwest Indus., Inc. v. Karavan Trailers, Inc.</u>, 175 F.3d 1356, 1359 (Fed. Cir. 1999) (en banc).  This case presents the question of whether Aero's recovery of both patent and trademark infringement damages represents an impermissible double recovery.  We believe that this question is properly determined under Federal Circuit law.  That is because, although the question relates in part to trademark damages, it also involves a matter unique to patent law, damages for patent infringement.  See <u>Fiskars, Inc. v. Hunt Mfg. Co.</u>, 279 F.3d 1378, 1381 (Fed. Cir. 2002) ("[T]he issue before us—whether a lost profits damages award should be set aside [under Rule 60(b)] because post-trial sales data may show the acceptability of a non-infringing alternative product—turns on a substantive area of patent law.  Because resolution of this issue necessarily requires an understanding of the distinctive characteristics of patent damages law, we apply Federal Circuit law in our review.").

We review the denial of a motion for a new trial under the law of the regional circuit, in this case the Seventh Circuit.  See <u>Koito Mfg. Co. v. Turn-Key-Tech. LLC</u>, 381 F.3d 1142, 1148 (Fed. Cir. 2004).  In the Seventh Circuit, a trial court may grant a new trial "where the verdict is against the clear weight of the evidence," while the court's ruling on a motion for a new trial is reversed only where there is a clear abuse of discretion.  <u>Trzcinski v. Am. Casualty Co.</u>, 953 F.2d 307, 315 (7th Cir. 1992).  Under this standard, the court "will not set aside a jury verdict if a reasonable basis exists in the

record to support the verdict." Id. Likewise, the Seventh Circuit reviews a district court's denial of a motion for remittitur for an abuse of discretion. Lampley v. Onyx Acceptance Corp., 340 F.3d 478, 483 (7th Cir. 2003).

Generally, the double recovery of damages is impermissible. See Junker v. Eddings, 396 F.3d 1359 (Fed. Cir. 2005); Bowers v. Baystate Techs., Inc., 320 F.3d 1317 (Fed. Cir. 2003); Catalina Lighting, Inc v. Lamps Plus, Inc., 295 F.3d 1277 (Fed. Cir. 2002); Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1362 (Fed. Cir. 1998); CPG Prods., Corp. v. Pegasus Luggage, Inc., 776 F.2d 1007, 1014 n.4 (Fed. Cir. 1985).

In Bowers, we recognized that double recovery for the same injury is inappropriate. 320 F.3d at 1327-28. We explained that "[t]he law is clear that the jury may award separate damages for each claim, 'leaving it to the judge to make appropriate adjustments to avoid double recovery.'" Id. (quoting Britton v. Maloney, 196 F.3d 24, 32 (1st Cir. 1999)). We held in Bowers that the trial court did not abuse its discretion by allowing the jury to award damages for copyright and contract claims for the same cause of action and then omitting the duplicative copyright damages. Id. at 1328 ("In this case, the breach of contract damages arose from the same copying and included the same lost sales that form the basis for the copyright damages. The district court, therefore, did not abuse its discretion by omitting from the final damage award the duplicative copyright damages.").

Catalina Lighting involved 35 U.S.C. §§ 284 and 289, the latter of which deals with damages for infringement of a design patent. 295 F.3d 1277.[10] In Catalina Lighting, we were faced with the question of whether "a patentee may recover both infringer profits and a reasonable royalty when both a design patent and utility patent have been infringed by the sale of a single product." Id. at 1291. We resolved the question by focusing on the conduct that had damaged the patentee: the sale of Catalina Lighting's infringing product. We stated:

> Lamps Plus is entitled to damages for each infringement, but once it receives profits under § 289 for each sale, Lamps Plus is not entitled to a further recovery from the same sale because the award of infringer profits under § 289 also constitutes "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."

Id.; see Junker, 396 F.3d at 1368 ("Furthermore, the dollar amount that Junker now seeks as damages for breach of contract is identical to the dollar amount the jury awarded him for infringement. Both claims arose out of the same set of operative facts regarding Galt's unauthorized use of the design Junker had developed. The circumstances at least suggest that awarding Junker the damages he seeks on his

---

[10]     Section 289 states:

Whoever during the term of a patent for a design, without license of the owner,
(1)     applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or
(2)     sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.
Nothing in this section shall prevent, lessen, or impeach any other remedy which an owner of an infringed patent has under the provisions of this title, but he shall not twice recover the profit made from the infringement.

35 U.S.C. § 289.

breach-of-contract claim would constitute a double recovery."); Celeritas, 150 F.3d at 1362 ("Celeritas stipulated to accept the single highest award from the three causes of action consisting of patent infringement, trade secret misappropriation, and breach of contract in order to avoid complex jury instructions dealing with avoiding duplicative damages. . . . The purpose of the stipulation was to avoid an inquiry into the overlap in the damage awards arising from multiple related claims."); CPG Prods., 776 F.2d at 1014 n.4 ("Though the district court ordered accountings for damages resulting from patent infringement and from unfair competition, Lark is not entitled to dual damages resulting from the same act." (citing Stewart & Stevenson Servs., Inc. v. Pickard, 749 F.2d 635, 644 (11th Cir. 1984))). Bowers, Catalina Lighting, Junker, Celeritas, and CPG Products teach that, in determining whether there has been an impermissible double recovery of damages, the inquiry focuses on whether the damages issue arose from the same set of operative facts.

Relying upon Bowers, Catalina Lighting, and CPG Products, defendants challenge the award of damages in this case. They contend that the $2.95 million Aero received as compensation for patent infringement and the $1 million it received as compensation for trademark damages amounted to an impermissible double recovery. Aero responds that the district court properly awarded Aero a reasonable royalty for Intex's patent infringement and a portion of Intex's profits for its trademark infringement because Intex's infringement of the '726 patent and infringement of the "ONE TOUCH" trademark constituted two separate wrongs. It distinguishes Bowers, Catalina Lighting, and CPG Products, asserting that the claims in those cases were based on a single wrongful act that caused a single harm. In addition, it relies on Nintendo of America,

<u>Inc. v. Dragon Pacific International</u>, 40 F.3d 1007 (9th Cir. 1994), where the court allowed Nintendo to recover trademark and copyright infringement damages arising from sales of the same video game cartridges.

Patent infringement damages are meant to compensate the patentee for the infringement, and a patentee is entitled to at least reasonable royalties. <u>See</u> 35 U.S.C. § 284 ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."). The Trademark Act of 1946, Pub. L. No. 79-489, 60 Stat. 427 (codified as amended in scattered portions of 15 U.S.C.) ("the Lanham Act"), allows a trademark owner to recover its damages, the defendant's profits, and the costs of the action, and the amount awarded "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

As indicated, at trial Aero sought patent infringement damages in the amount of $3.4 million. This was based upon the testimony of Aero's damages expert, Mark Alan Peterson, that Aero was entitled to a 15.7% reasonable royalty on $21.8 million in sales of the accused Intex mattress, which would amount to $3.425 million. Aero argued to the jury that it should award "3.4 million dollars of that 22 million dollars for patent infringement." Aero asserted that this amount would "compensate Aero for the [patent] infringement. . . ." At the same time, Aero sought trademark infringement damages in the amount of $2.2 million. This was based upon Aero's contention that defendants had made $2.2 million in profits based on sales of the accused Intex mattresses. Defendants' damages expert, Roy Weinstein, testified at trial that Intex had sold $22

million worth of accused Intex mattresses, and Intex's profits were 10.4%, so Intex had made approximately $2.2 million in profits.[11] In short, Aero used defendants' patent infringement damages calculations in support of its proposed amount of trademark damages.

The jury awarded Aero $2.95 million dollars for the patent infringement—presumably a reasonable royalty as Aero requested—and $1 million in Intex's and Quality Trading's profits for the trademark infringement. This was less than the damages that Aero requested—reasonable royalty damages of $3.4 million for the patent infringement and disgorgement of Intex's profits of $2.2 million for the trademark infringement.

As just seen, the record demonstrates that Aero based both its patent and trademark damages solely on sales of the accused Intex mattresses. Aero did not rely on any other evidence in support of its trademark damages. In other words, there was no evidence introduced at trial of Intex's use of the mark "ONE TOUCH" other than in connection with the sales of mattresses that formed the basis for Aero's patent infringement claim. In short, all of the damages awarded to Aero flowed from the same operative facts: sales of the infringing Intex mattresses. Aero was fully compensated for defendants' patent infringement when it was awarded a reasonable royalty for patent infringement based on sales of the infringing Intex mattresses. It could not also be awarded defendants' profits for trademark infringement based on the same sales of the same accused devices. This is the result compelled by Bowers, Catalina Lighting,

---

[11] At trial, defendants asserted that Aero's proposed royalty rate for patent infringement damages was too high because defendants were only making a 10% profit. Based on this, defendants argued that a reasonable royalty rate would be 5%, or $1.1 million dollars.

Junker, Celeritas, and CPG Products.  We thus hold that the district court abused its discretion by allowing to stand the jury's award to Aero of $1 million in trademark damages.

Finally, we do not think that Nintendo helps Aero.  Nintendo stated that, "[p]ut together, selling the cartridges may have been one act, but it was two wrongs [trademark and copyright infringement]."  40 F.3d at 1011.  The Nintendo court reasoned that "Congress created two separate statutory schemes to govern copyrights and trademarks; in order to effectuate the purposes of both statutes, damages may be awarded under both."  Id.  Further, the court reasoned that Nintendo "did not recover the same type of damages under both acts" because it recovered actual damages under the Lanham Act and it elected and recovered statutory damages, instead of actual damages, under the Copyright Act.  Id.[12]  From our standpoint, the problem with Aero's reliance on Nintendo is that an award of both patent and trademark infringement damages in this case would be contrary to our decisions in Bowers, Catalina Lighting, Junker, Celeritas, and CPG Products.  Under these cases, even though damages are claimed based upon separate statutes or causes of action, when the claims arise out of the same set of operative facts, as is the case here, there may be only one recovery.

---

[12]     The damages provision of the Copyright Act states:

[a]n infringer of copyright is liable for either—
(1)     the copyright owner's actual damages and any additional profits of the infringer . . .; or
(2)     statutory damages . . . .

17 U.S.C. § 504(a).

CONCLUSION

In sum, we hold as follows:

(1)     The district court did not err in construing the term "inflation input" in claims 9 and 12 of the '726 patent or the term "complete hermetic seal" in claim 12 of the '726 patent.  Accordingly, the judgment of infringement is affirmed.

(2)     The district court did not err in ruling that claim 12 of the '726 patent is not invalid by reason of indefiniteness.

(3)     The district court erred in allowing the jury's award of $1 million in trademark infringement damages to stand because doing so resulted in an impermissible double recovery in favor of Aero.  That award is vacated.

Accordingly, the judgment of the district court in favor of Aero is affirmed-in-part and vacated-in-part.  The case is remanded to the district court for entry of judgment in Aero's favor in the principal amount of $5.9 million.

COSTS

Each party shall bear its own costs.

AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED

# United States Court of Appeals for the Federal Circuit

05-1283

AERO PRODUCTS INTERNATIONAL, INC.
and ROBERT B. CHAFFEE,

Plaintiffs-Appellees,

v.

INTEX RECREATION CORP.,
QUALITY TRADING, INC. and WAL-MART STORES INC.,

Defendants-Appellants.

DYK, Circuit Judge, concurring.

I join the majority opinion with the exception of Part I.A. of the discussion, which addresses the inflation-input limitation in claims 9 and 12 of the '726 patent. While I agree with the majority that the district court did not err in construing the term or in excluding evidence concerning that limitation, my understanding of the defendants' argument is somewhat different than the majority's, and my reasons for rejecting the argument are necessarily different as well.

In my view, defendants' primary complaint is that during the trial the district court improperly sustained Aero's objection to testimony offered by defendants that the inflation input was the end of the coupling that is most distal from the interior of the inflatable body, i.e., the top of the tall cylinder in the accused device, depicted in the majority opinion. The district court ruled that this testimony was inconsistent with the

district court's claim construction of the claim term "inflation input." Defendants correctly point out that such testimony was not inconsistent with the formal definition adopted by the district court (and to which they did not object), defining the term "inflation input" as the point "where air enters the passageway." The majority appears to approve of this limited claim construction. Maj. Op. at 15. However, the claim construction order elaborated on the definition, and the proferred testimony was inconsistent with this elaborated definition. The order explicitly rejected the defendants' argument that the claim 9 "inflation input" in the accused device was the top of the tall cylinder, on the ground that the top of the tall cylinder was not "contiguous" to the flared end as the language of claim 9 requires.

I agree with the district court's construction of claim 9 that the inflation input is not the end of the coupling that is the most distal from the interior (i.e., the top of the tall cylinder in the accused device). Claim 9 provides that the "coupling ha[s] an open end defining the inflation input and a flared end, <u>contiguous therewith</u>." <u>Id.</u>, col. 11, ll. 5-7 (emphasis added). As the district court held (quoting in part from the defendants' brief), "it can be seen that the 'generally circular coupling' [in the accused device] consists of the structure between the [top of the tall cylinder] and the flared end. If a structure is between the [top of the tall cylinder] and the flared end, then these two pieces cannot be contiguous." J.A. 133 (internal quotation marks omitted). Thus, I see no error in this construction of the term as it appears in claim 9, nor in the district court's determination that the "inflation input" could not be the top of the tall cylinder in the accused device under the district court's claim construction. Both parties assume that the term "inflation input" has the same meaning in claim 12.

05-1283                                    2

The district court's claim construction did not prevent defendants from otherwise arguing that the accused device did not satisfy the claim limitations. Thus, defendants could have argued that the top of the short cylinder cannot be an inflation input because claims 9 and 12 of the '726 patent require that the valve for controlling the transfer of air be "disposed between the interior [of the inflatable body] and the inflation input."

I see no error in the district court's construction of the term "inflation input," nor in its evidentiary ruling.